CONSOLIDATED SUN RAY, INC., Sun Ray Drug Co., and Bargain City U. S. A., Inc.

v.

Harry R. LEA and Roslyn T. Lea, Copartners trading as Harry R. Lea & Co., Appellants.

No. 17004.

United States Court of Appeals Third Circuit.

Argued March 19, 1968.

Decided Sept. 16, 1968.

Rehearing Denied Oct. 16, 1968.
Certiorari Denied Jan. 20, 1969.

See 89 S.Ct. 688.

Arthur R. Littleton, Morgan, Lewis & Bockius, Philadelphia, Pa. (Christopher K. Walters, Philadelphia, Pa., on the brief), for appellants.

Robert H. Malis, Malis & Feldman, Philadelphia, Pa. (David S. Malis, Philadelphia, Pa., on the brief), for appellees.

Before BIGGS, McLAUGHLIN and FORMAN, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

### I.

### FACTS.

Consolidated Sun Ray, Inc. (Consolidated), Sun Ray Drug Co. (Sun Ray), a division of Consolidated, and Bargain City U.S.A., Inc. (Bargain City) have sued Harry R. Lea and Roslyn T. Lea (Lea), insurance brokers, alleging breaches of duty by Lea to the plaintiffs in failing to procure insurance. The suit at bar is concerned with losses incurred by the plaintiffs because of a fire at Bargain City which occurred on December 24, 1959. The court had before it stipulations of counsel and documentary evidence as set out in the footnote.[1] Both parties moved for judgment on the record. The court below granted the plaintiffs' motion and denied that of the defendants. Lea has appealed. The facts which can be garnered from the stipulation and the record follow.[2]

Consolidated was created by the merger on February 2, 1959 of Consolidated Retail Stores (Retail Stores) and Sun Ray. Bargain City was created as a joint venture by Consolidated and another company with which we are not concerned. Ninety percent of Bargain City's stock is owned by the public and five percent is owned by Consolidated.[3] Bargain City operates shopping centers, leasing space, furniture and equipment and providing services to concessionaires in return for a percentage of sales. Prior to the merger Lea had procured insurance policies from Eagle Fire Insurance Company (Eagle) and Eastern Fire &

1. We point out preliminarily that the trial of this case started before the late lamented Judge Allan K. Grim sitting without a jury and because of his death before completion of proof no decision was rendered. To avoid a retrial, the parties agreed to have the issue decided upon the record, consisting of the complaint (Document #1), the answer (Document #5), the plaintiffs' reply to new matter (Document #11), pretrial memoranda (Documents #7 and #8), request for admission of genuineness of documents (Document #12), and the answer thereto (Document #13).

2. The opinion of the court below is reported at 276 F.Supp. 132.

3. The remaining five percent is owned by Blauners, Inc., the other party to the Bargain City joint venture.

Casualty Company (Eastern) insuring Retail Stores by name against loss by fire and loss occasioned by business interruption due to fire damage. Insurance against business interruption is generally referred to as "U & O", "Use and Occupancy" insurance. Within a short time after the merger[4] Lea procured amendments to the policies from Eagle and Eastern naming "Consolidated Sun Ray, Inc. &/or any affiliated or subsidiary companies or corporations, A.I.M.A.,"[5] effective on February 2, 1959 and specifically naming Bargain City as an insured as of February 10, 1959. The Eagle and Eastern policies were cancelled as of July 1, 1959.

Upon being notified of the cancellations, plaintiffs requested that Lea replace the policies. Consequently, Lea contacted the Anka Agency, Inc. (Anka) and Anka in turn got in touch with The Steel Insurance Company of America (Steel), whose principal office appears to have been in Chicago, Illinois. There can be no doubt whatsoever from the record that Lea undertook to provide U & O coverage as provided for by the Eagle and Eastern policies except that payroll insurance, not here relevant, was to be excluded.[6] See the account of pertinent events as set out hereinafter.

At some point Anka had furnished Lea a brochure[7] respecting the nature of Steel's business. The first paragraph of this brochure states that Steel is chartered by Illinois as a "Capital Stock Fire Insurance Company.", and that "All business written is produced by qualified agents or brokers." The second paragraph states: "In addition to being an admitted company in Illinois * * * Steel * * * is also admitted in Ohio.",

and that "The Company is a non-admitted or 'Surplus Line' insurer in all other States." and that "All surplus line business is handled on a brokerage basis through agents or brokers licensed in their own States." The quoted portions of the brochure put Lea on notice that any insurance issued by Steel outside of Illinois and Ohio, and in particular in Pennsylvania, was not written by Steel direct but through brokers and agents.

Anka is an insurance agent. On July 7, 1959, unknown to Lea until after the fire loss referred to had occurred, Luber, vice-president of Steel, wrote a letter to Kabat of Anka. The letter stated in pertinent part: "In line with our meeting of today this is to confirm our agreement along the following lines: 1. The Steel Insurance Company of America will recognize the Anka Agency, Inc. and Lindquist-Burns as our full and exclusive representatives in the Eastern states. However, it is understood that in the state of Pennsylvania we reserve the right to restrict your sole activities to the Philadelphia metropolitan area and in the state of New York your sole authorization does not encumber [sic] the Buffalo metropolitan. 2. In regard to Binding Authority you are hereby authorized to be able to bind for our Company risks to the extent of 10% of the total line. However, you shall not assume risk for the Company in excess of $150,000. 3. These lines are to be submitted to the Steel Insurance Company of America on a facultative basis with it clearly understood that all underwriting data should be in the hands of the Company within ten days from the assumption of liability." It is contended by the plaintiffs that the foregoing shows that

---

**4.** The exact time is not clear from the record. See note 3 cited to the text, 276 F.Supp. at 134.

**5.** This is an abbreviation for "As Interests May Appear."

**6.** On July 31, 1959 McGeer of Bargain City wrote Lea as follows: "Thank you for your letter of 7/23/59, advising of the replacement of the captioned [Eagle and Eastern] policies as of July

1, 1959. We assume that the coverage and rates afforded Consolidated Sun Ray is also applicable to Bargain City USA., Inc. and that we will receive a policy shortly with our name included. If there is any question in this connection, please advise the writer immediately." P's Exhibit I.

**7.** D's Exhibit 1.

Anka was without power to bind Steel in respect to the fire loss.

From early in 1959 a series of communications took place between plaintiffs, Seligman of Lea, Jenchel and Kabat of Anka, and Steel. Jenchel was secretary-treasurer and Kabat was president of Anka. Kabat attended meetings with Seligman and discussed the replacement of the insurance cancelled by Eagle and Eastern. Kabat received from Lea a memorandum indicating the coverage of the Eagle and Eastern policies, the equivalent of which was to be provided for by Steel if Steel were to issue policies, and that the U & O coverage would be provided for with the exception of ordinary payroll insurance and that Bargain City should specifically be named as an assured.[8] It was further stipulated by the parties that Jenchel "presented this memoranda and notations to Mr. Morton Luber, Vice President of Steel * * * in July and discussed the same with him" and that "[a]s a result of that meeting * * * the [binders were] issued by Steel * * * covering Consolidated * * *, et al., and binders were issued covering * * * other * * * assureds."[9] Kabat's first contact with Steel had been in June, 1959. The binder insured "Consolidated Sun Ray, Inc., &/or any affiliated or subsidiary companies or corporations, as interest may appear" as of June 30, 1959 at 11:59 P.M. The original amount of the insurance was $500,000, subsequently raised to $750,000",[10] but the date the binder was signed does not appear from Lea's appendix.[11] The fact that coverage for loss of use and occupancy, "U & O", was not included is instantly apparent from an examination of the binder. It is also clear that Bargain City was not specifically included in the binder, albeit it is asserted by the appellants that the phrase "any affiliated or subsidiary companies" was sufficient to include Bargain City. The printed form of the binder provided that it expired on the thirty-first day following the effective date of the binder or upon the delivery of a policy, "whichever shall first occur."

On July 23, 1959 Lea wrote McGeer of Bargain City stating: "Please be advised that as of July 1, 1959 we have replaced the above policies with [Steel]." The "above policies" referred to as replaced were the Eagle and Eastern policies. Paragraph 5 of Lea's letter stated: "Use & Occupancy coverage which is included in the form without additional charge is to exclude ordinary payroll." In fact, the terms of the policy which was eventually issued specifically excluded all U & O coverage and did not include protection for Bargain City by name.[12] McGeer wrote to Lea on July 31, 1959 and stated, among other things: "We assume that the coverage and rates afforded Consolidated * * * is also applicable to Bargain City * * * and that we will receive a policy shortly with our name included." McGeer added in a separate paragraph: "If there is any question in this connection, please advise the writer immediately."[13] On August 6, 1959 Seligman, as we have said, Lea's employee, wrote McGeer stating: "You are correct in that the rates afforded Consolidated * * * are also applicable to Bargain City. * * * You will be receiving a policy with your name included just as soon as it is issued."[14] Also on August 6, 1959, DeLucia, apparently an employee of Lea, wrote to Jenchel the following: "Please make certain that wherever Bargain City appears in the above policy [Consolidated] it reads: Bargain City U. S. A., Inc."[15] On September 18, 1959 Seligman wrote King of the "Sun Ray Drug Division"

8. Paragraphs 7, 10(a), (b), (c), of the second stipulation of counsel.

9. Paragraph 10(d) of the second stipulation of counsel.

10. The effective date of the binder was given as "6–30–59".

11. See P's Exhibit R.

12. P's Exhibit AA.

13. P's Exhibit I.

14. P's Exhibit J.

15. P's Exhibit K.

enclosing invoices and "your copy of the captioned policy."[16] Invoices were included which it is asserted by Lea showed that U & O coverage was included, and this fact seems not to be disputed by the plaintiffs-appellees. The letter states: "There are a number of endorsements which were inadvertently omitted from the policy, but they will follow as soon as received from the Company and in the meantime you are covered by binder for these endorsements."[17] Seligman on September 24, 1959 issued a memo to Jacobson, an employee of Lea, enclosing a copy of the letter of September 18 to Sun Ray and stated that the new Steel policy was to be checked against the Eastern policy and to send a binder "to company for all the things that are missing." In capital letters there follows the admonition, "Especially watch Use & Occupancy portion." "[G]o over these items with me but send binder over first."

The following appears from the second stipulation of counsel: "On November 16, 1959, Mr. Seligman not having received written confirmation of the U & O coverage inclusion and of fur and jewelry coverage in a number of the Steel policies went to Mr. Jenchel's office at Anka Agency and insisted that Mr. Jenchel call Steel Insurance Company to confirm that U & O coverage was as agreed. Mr. Jenchel placed a call to a Mr. Luber of Steel Insurance Co. and had a conversation with him in the presence of Mr. Seligman. Immediately after the telephone conversation, Mr. Jenchel dictated and then signed the document dated November 16, 1959 which document speaks for itself and is Exhibit 3."[18] The letter referred to is D's Exhibit 3 and is as follows: "Effective November 16,

1959, we hereby agree to extend the above captioned Steel policies to cover Jewelry & Fur, subject to a minimum deductible of $250.00. Other deductibles to apply where policy deductibles are greater. No coverage will apply in show windows. This additional cover is subject to full information being supplied no later than Wednesday, November 18. On Consolidated Sun-Ray [sic.] it is understood that the policy is extended to cover U & O as per previous coverage in the Eagle Fire Insurance Co. [signed] "Anka Agency, Inc., Arthur S. Jenchel."[19]

It will be observed that it is stated that U & O coverage is extended "as per previous coverage in the Eagle Fire Insurance Co." but that Bargain City is not mentioned. Bargain City, as we have said was specifically covered by name in the Eagle policy by an endorsement dated "2–10–59" and was also so covered by the Eastern policy by an endorsement dated "2–10–59". The letter of November 16, 1959 did not put any time limit on coverage but the prior printed binder issued by Steel to the plaintiff as we have stated, was limited to thirty-one days.[20] Lea points out that other binders, for example, one that issued on November 16, 1959 had no time limitation[21] but this binder actually was issued by Anka and not by Steel. It is contended by Lea that the binder of November 16, 1959 was to have a longer tenure than thirty-one days, a tenure continuing until a more formal document than the letter had issued covering Bargain City. Lea asserts that because Steel Policy No. 563, the policy sued on in the court below and, presently before us, was issued seventy-five days after the issuance of the original binder this makes

---

16. The caption was "Steel Insurance Co. [Insurance Policy] No. 563."

17. P's Exhibit L.

18. Stipulation of counsel, Paragraph 9 "(i)".

19. D's Exhibit 3.

20. P's Exhibit G.

21. The binder stated that the "additional cover is subject to full information being supplied no later than Wednesday, November 18." The record does not show whether or not such information was furnished and since the parties have not mentioned it in their briefs nor the court below referred to it in its opinion, we will assume compliance with this provision.

plain the fact that the thirty-one day waiver was not considered to be effective by the parties.[22]

On November 23, 1959 Luber of Steel wired Jenchel of Anka: "Please cancel immediately binder covering jewelry [,] appliances and furs on all outstanding lines." It is contended by Lea that the wire demonstrates that Anka "did in fact have the right and authority to bind Steel."[23] It will be observed, of course, that Steel did not cancel the U & O coverage, a fact which, according to Lea, reinforced Lea's alleged reasonable belief that Steel had approved the issuance by Anka of the binder.

Within a comparatively short time thereafter, on December 4, 1959, Jenchel of Anka wrote Seligman of Lea, stating: "Confirming our telephone conversation of yesterday and once again my conversation today with Paul Borden [of Steel], I wish to advise you there is no coverage at all for any jewelry, fur or other similar items under any of the Steel Insurance Co. Policies. Our binder under which we extended these policies has been cancelled by the Company." Lea apparently accepted this cancellation without demur. No formal endorsement or binder was ever issued by Steel granting U & O coverage of Bargain City or naming Bargain City as an insured.

On December 11, 1959 Luber of Steel wrote a letter addressed to the "Insurance Buyer, Consolidated Retail Stores" stating that Steel was cancelling Policy No. 563 as of December 31, 1959. The disastrous fire causing plaintiffs' losses occurred, as we have said, on December 24, 1959. The plaintiffs notified Steel of the loss and made demand for payment. Steel refused payment, denying liability.

On December 28, 1959 Seligman of Lea wrote a letter to Kabat of Anka, stating in pertinent part the following: "Re: Consolidated Sun Ray, Inc. et al. *Steel*

*Insurance Co. Policy #563.* Dear Darwin: Confirming our discussion this afternoon, there are a number of outstanding endorsements due under the above policy all of which had been previously agreed to. Since we understand that the endorsements are not issued in your office, but by the Chicago office of the Steel Insurance Company, we ask that you please have all of the outstanding endorsements issued if they have not already been prepared by the company. Among the endorsements that we are awaiting are the following: * * * 2. Issue use and occupancy endorsement as per wording of Eagle Fire Policy No. NYIM 80015 which was previously submitted to the Steel Insurance Company except that coverage is excluded for ordinary payroll. 3. Include the name Bargain City, U. S. A., in the title of the assured. * * * It would be appreciated if the endorsements have not been prepared by the Steel as of now that you secure their authorization to have the endorsements issued by your agency in New York. Please accept our thanks for your cooperation."[24] There was no response to this letter.

The plaintiffs brought three suits in the court below, two against Steel and the suit at bar against Lea. As stated in the opinion of the court below: "Steel defended the suits against it on the grounds, inter alia, that (a) Bargain City was not covered by the policy since it was neither (i) a named assured nor (ii) an affiliate or subsidiary of Consolidated; (b) U & O coverage was not afforded any assured since (i) the policy expressly excluded U & O coverage and (ii) Anka Agency was not authorized to bind Steel by any writing Anka might have issued purporting to bind such coverage; (c) plaintiffs had negligently or fraudulently failed to furnish complete information concerning their prior loss experience and thus the policy was procured by plaintiffs by material false and misleading statements; and (d) the policy had been is-

---

22. See the second Stipulation of Counsel, Paragraph 6, and P's Exhibit L.

23. Appellants' brief, pp. 19–20.

24. D's Exhibit 22.

sued to insure Consolidated only as to those locations comprising Retail Stores division of Consolidated." [25]

## II.

## Law.

The court below decided that the law of Pennsylvania was applicable and that Lea in failing to procure endorsements for U & O coverage and specifically naming Bargain City breached the duty owed the plaintiffs-appellees as an insurance broker. The court said: "Under Pennsylvania law, which is applicable in this diversity suit, whether the charge is negligence or breach of contract, the brokers's conduct is measured by the same standard." [26], citing Talley v. Hoffman, 18 Pa.Dist. & Co.R.2d 725, 729 (1959) as follows: "[A]n insurance broker is under a duty to exercise the care that a reasonably prudent businessman in the brokerage field would exercise under similar circumstances and if the broker fails to exercise such care and if such care is the direct cause of loss to his customer, then he is liable for such loss unless the customer is also guilty of failure to exercise care of a reasonably prudent businessman for the protection of his own property and business which contributes to the happening of such loss." [27] The district judge also cited with approval, inter alia, 16 Appleman, "Insurance Law and Practice" § 8841, p. 510, which states: "Liability of Broker—Failure to Procure Insurance. An insurance broker is the agent of the insured in negotiating for a policy, and owes a duty to his principal to exercise reasonable skill, care, and diligence in effecting insurance. Thus he may be held liable where he has breached a contract to procure insurance for his principal. And while such broker is not obligated to assume the duty of procuring a policy, without consideration for his promise, he must exercise ordinary care in the performance of such duty when assumed, the promise to take the policy being a sufficient consideration. He is charged with the exercise of reasonable care and skill in making inquiries and obtaining information concerning the responsibility of the insurer with whom they place [sic.] the risk, and is liable for any loss occasioned by such want of care. If a broker or agent of the insured neglects to procure insurance, or does not follow instructions, or if the policy is void or materially defective, through the agent's fault, he is liable to his principal for any loss he may have sustained thereby. If the agent or broker fails to act with the proper and customary skill and care generally used by those in a like business, such neglect or breach of duty will render him liable in damages, not exceeding the amount of insurance he was employed to effect. It has been held that such principal may sue either for breach of contract or in tort for a breach of duty. It is generally considered that if the neglect or breach of duty of such broker results in loss to his principal, the broker is liable to the same extent as the insurer would have been liable had the insurance been properly effected, and must pay the resulting loss." [28] (Notes to the text omitted). See also Couch on Insurance, 2d, Vol. 3, § 25:55, § 25:57–59. The court below then discussed Lea's defenses, which were substantially the same as those asserted in this court, i. e., that Lea had breached no duty and that not all of Steel's defenses were attributable to Lea's asserted breach of duty, and "unless all of Steel's defenses are attributable to [Lea's] fault, Lea cannot be held liable." [29] The trial judge went on to say: "I am satisfied by a preponderance of the evidence on this stipulated record that Lea's conduct fell below the standard prescribed for insurance brokers; that Lea's breaches of duty gave rise to all of Steel's colorable defenses in the suits on the policy and resulted in

25. 276 F.Supp. at 135.

26. Id. at 136.

27. Ibid.

28. 276 F.Supp. at 136.

29. 276 F.Supp. at 136.

plaintiff's settlement of the suits on the policy at a substantial loss. Plaintiffs are entitled to be compensated for that loss." [30]

The court then discussed the "colorable" defenses raised by Steel. In substance these were that the plaintiffs had instructed Lea to procure an endorsement from Steel naming Bargain City as an assured, and while conceding that Lea failed to do this Lea asserted that no harm resulted from this failure because Steel's policy insured Consolidated and "its Affiliated or Subsidiary Companies or Corporations" and that Bargain City was an affiliate of Consolidated. Consolidated owned less than 5% of Bargain City's stock. The court below stated in its opinion: "Since plaintiffs have admitted that Bargain City is an affiliate of Consolidated, Lea argues that Bargain City was covered by the policy * * *." [31] We can find no admission in the record by the plaintiffs that Bargain City was an affiliate of Consolidated. We are inclined to the view that Bargain City was not an affiliate. Section 1504 of the Internal Revenue Code, 26 U.S.C.A. § 1504, defines affiliation in part in terms of 80% ownership of the voting stock of the allegedly affiliated corporation. The predecessor statute, § 240(b) of the Revenue Act of 1918 was construed by a substantial body of case law, establishing that legally enforceable right to control the voting stock of any corporation was necessary for affiliation. See for example Handy & Harman v. Commissioner of Internal Revenue, 47 F.2d 184 (C.C.A.2nd, 1931). The Securities Act of 1933 also defines affiliation in terms of control. Section 5 of the Interstate Commerce Act, 49 U.S.C.A. § 5 provides an additional definition of affiliation. Again, the criterion is control. In McLean Trucking Company v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944), this Act was construed in a situation where ownership of 9,000 shares out of 1,000,000 was held not to constitute affiliation. Black's Law Dictionary, 4th edition, page 80, defines affiliation as "legally enforceable control". The decision of such an issue is one fraught with peril for even the most skillful trial advocate and we are far from certain that Lea would have prevailed upon it had it been decided by Judge Grim in the original proceeding. The issue of the right of Anka to bind Steel also is a difficult one and there are others, all of which could be avoided had Lea carried out its undertaking to the plaintiffs-appellees to have Bargain City named in the policy and to have that policy include U & O coverage.

The court below also said: "The point in this suit is not whether Bargain City was in fact an affiliate of Consolidated and therefore covered by the policy, rather the issue here is whether the omission of Bargain City made available to Steel a defense it could not have raised if plaintiffs' instructions had been carried out. The answer to the pertinent question is obvious. Had Bargain City been named, its relationship with Consolidated would have been irrelevant; with the omission, the relationship became a matter of importance. Since Consolidated owned less than 5% of Bargain City stock, coverage for Bargain City as an 'affiliate' was open to dispute, a dispute which would have been avoided if Bargain City had been specifically named as an assured. It may well have been for the purpose of avoiding such a dispute that plaintiffs instructed Lea to include Bargain City as a named assured." [32]

■ Ae we apprehend the lower court's opinion, the trial judge found that Lea's failure to obtain explicitly adequate authorized policy coverage as required by the plaintiffs resulted from Lea's failure to exercise the care that a reasonable and prudent insurance broker would have exercised under the circumstances.

30. Ibid.

31. Id. at 137.

32. 276 F.Supp. at 137.

Lea points out, however, that it was stipulated that it is common practice to rely on oral and written binders until the issuance of a policy or an endorsement, and that Kabat, who represented Anka, was known to Seligman of Lea as a New York insurance broker of good reputation and of at least twenty years experience and that therefore Lea was entitled to rely on Kabat's representations and that the trial judge was in error in not so. finding. We cannot agree, however, that under the circumstances at bar the trial court was in error in this regard. Lea's efforts to fulfill contractual obligations were palpably insufficient.

■ Lea contends, however, that the court below had before it no expert testimony as to what would be the standard of conduct of a reasonable and prudent insurance broker under the circumstances and that evidence as to such a standard was necessary. The decision most relevant to the case at bar that we have been able to find is Talley v. Hoffman, supra, 18 Pa.Dist. & Co.R. 2d at 729 in which Judge Greevy of the Court of Common Pleas of Lycoming County stated: "A principal may sue his agent to recover damages for all losses sustained by him because of the agent's breach of duty. The general rule is that an agent, in executing his agency, is required to exercise the degree of care which an ordinarily prudent person would exercise under the circumstances. If he fails to exercise such ordinary care, he is liable to the principal for all losses sustained by him in consequence thereof. Specifically, an insurance broker is under a duty to exercise the care that a reasonably prudent businessman in the brokerage field would exercise under

similar circumstances and if the broker fails to exercise such care and if such care is the direct cause of loss to his customer, then he is liable for such loss unless the customer is also guilty of failure to exercise care of a reasonably prudent businessman for the protection of his own property and business which contributes to the happening of such loss." See also Kovler v. Easterby, 79 Pa.Dist. & Co. 102 (1951).[33]

■ We can find no Pennsylvania case directly in point on the issue as to whether negligence of an insurance broker must be proved by expert testimony but a decision of the Court of Appeals of Maryland is suggestive, we think, of what the Supreme Court of Pennsylvania might hold in a case similar to that at bar. In Lowitt v. Pearsall Chemical Corporation of Maryland, 242 Md. 245, 252, 219 A.2d 67, 73 (1966), the Court of Appeals of Maryland held that expert testimony was not necessary to establish the degree of skill required of an insurance broker and that the broker's contention that the degree of skill and diligence usually employed by brokers under circumstances· similar to those at bar could only be determined by expert testimony was held to be incorrect. See Insurance Law and Practice, 16 Appleman, Section 8841 at 521. It is also the law that in an action against an insurance broker by an insured, the broker has the burden of proving that the insured suffered no actual damage by reason of the broker's breach of duty. See Appleman, supra, at 521.

■ Finally, Lea argues that it is necessary in order for the plaintiffs to recover that they demonstrate Lea's negligence was responsible for all Steel's

33. Since jurisdiction in this case is based on diversity of citizenship we apply the law of Pennsylvania including the conflict of laws rules of Pennsylvania. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). However, New York, the only other state jurisdiction whose law might

be held by a Pennsylvania court to be applicable in the circumstances at bar, has the same test of liability of an insurance broker as that stated in Talley v. Hoffman, supra. See Fleetwood Motors, Inc. v. John F. James & Sons, Inc., 38 Misc.2d 499, 237 N.Y.S.2d 668 (Sup.Ct., Queens County 1963).

defenses and produce evidence of specific monetary damages relatable to each defense. At an earlier point in this opinion we stated the defenses set up by Steel in the suit before Judge Grim. Not a single one of Steel's defenses would have been available to it if Lea had done what should have been done. One fact should be particularly noted in this connection: after the fire on December 28, 1959 Lea wrote Kabat of Anka and asked him to procure from Steel endorsements to include Bargain City as an insured. If Lea deemed Bargain City to be covered why the request for the issuance of ·endorsements after the calamity had occurred?

We agree with the court below that Lea cannot be conceived of as acting with the reasonable skill and diligence of an insurance broker. In our opinion, even viewing the facts *de novo*, we cannot but conclude as did the court below that Lea was guilty of negligence.[34]

■ We note that the defense of contributory negligence asserted by Lea against the plaintiffs has not been pressed on appeal. In any event we deem the defense to be without merit.

■ Lea also contends that the amount of the judgment has been wrongly calculated and is too large. But the court below stated in its opinion, 276 F.Supp. at 136, "The parties have agreed as to the computation and amount of the damages, if they are to be awarded." Note 9 cited to the text sets up a calculation and damages of $580,023. The statement of Judge Luongo as to the agreement of the parties has not been demonstrated to be incorrect.[35] The judgment will stand as entered.

**34.** We recognize, of course. as Lea contends, that where the facts are stipulated to, no oral testimony being received, we may substitute our factual conclusions without the necessity of determining that the findings of fact of the lower court were clearly erroneous as required by Rule 52(a) Fed.R.Civ.Proc., 28 U.S.C. See In re Kellett Aircraft Corp., 186

F.2d 197 (3 Cir. 1950); and United States v. United Steelworkers of America, 271 F.2d 676, 685 (3 Cir.), aff'd 361 U.S. 39, 80 S.Ct. 1, 4 L.Ed.2d 12 (1959).

**35.** In so stating we do not pass upon the correctness of the calculation under the terms of the policy.